# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 17-8868-GW(Ex) | Date | June 4, 2018 |
|---|---|---|---|
| Title | *Eric Weber, et al. v. Amazon.com, Inc., et al.* | | |

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE |
|---|---|

| Javier Gonzalez | Katie Thibodeaux | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Jamin Samuel Soderstrom | Jedediah Wakefield |

**PROCEEDINGS:**    **DEFENDANTS' MOTION TO DISMISS CLAIMS AS TO PLAINTIFF BRYAN REES FOR LACK OF PERSONAL JURISDICTION [27];**

**AMAZON'S MOTION TO COMPEL ARBITRATION AND DISMISS CLAIMS AS TO PLAINTIFF ERIC WEBER [28]**

The Court's Tentative Ruling is circulated and attached hereto. Court hears oral argument. For reasons stated on the record, the motions are continued to July 23, 2018 at 8:30 a.m., with simultaneous supplemental briefs to be filed by noon on July 16, 2018. Briefs will not exceed nine pages. Counsel will also attempt to stipulate as to data.

|  | : | 35 |
|---|---|---|
| Initials of Preparer | JG | |

**_Weber v. Amazon.com, Inc._**, Case No. 2:17-cv-08868-GW-(Ex)
Tentative Rulings on: (1) Defendants' Motion to Compel Arbitration, and (2) Defendants'
Motion to Dismiss Plaintiff Rees for Lack of Personal Jurisdiction

# I. Background

## A. Procedural History

Eric Weber ("Weber") and Bryan Rees ("Rees") (together "Plaintiffs") sue, on behalf of themselves and similarly situated individuals, Amazon.com, Inc. ("Amazon") and Amazon Services, LLC ("Amazon Services") (together "Defendants") for: (1) violation of the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693 *et seq.*; (2) violation of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2510 *et seq.*; (3) Fraud in the Inducement; (4) Conversion; (5) Interference with Contracts; (6) violation of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500 *et seq.*; (7) violation of Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 *et seq.*; (8) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*; (9) violation of North Carolina's Unfair Competition Law; and (10) Restitution/Unjust Enrichment. *See generally* First Amended Complaint ("FAC"), Docket No. 25. Plaintiffs' claims arise out of Amazon's alleged practice of storing customers' credit card information without authorization and subsequently charging stored credit cards without authorization for purchases made through various Amazon platforms and services. *See id.*

Two motions are now pending before the Court. The first is Defendants' Motion to Compel Arbitration as to Plaintiff Eric Weber.[1] *See* Amazon's Notice of Motion and Motion to

---

[1] The Court deferred ruling on the MTC on April 2, 2018. *See* April 2, 2018 Civil Minutes ("Weber MTC Ruling I") at 16, Docket No. 35. The Court requested three additional components to supplement the record: (1) all versions of the Amazon "Flows" that were potentially encountered by Weber on dates that Defendants wish to contend Weber purchased an Amazon product limited if possible to a few dates certain; (2) copies of the operative conditions of use upon Weber's first purchase and the operative versions thereafter; (3) additional evidence as to Weber's Amazon Prime activation on October 26, 2017; (4) complete printouts of three Flows contained in Exhibit 9 to Ressmeyer's initial declaration; and (5) an optional 7-page brief related to *Douglas v. United States Dist. Court*, 495 F.3d 1062 (9th Cir. 2007), in light of the Court's clarification of a relevant order in *McKee, see McKee v. Audible, Inc.*, Case No. 17-cv-01941, Docket No. 37 ("*McKee* Order"). *See* Weber MTC Ruling I at 15-16.

The parties substantially complied with these requests, submitting the Joint Statement of Stipulated Facts Re Motion to Compel Arbitration and Dismiss Claims as to Plaintiff Eric Weber ("JSSF"), Docket No. 39. Along with the JSSF, the parties included as sub-docket entries a number of exhibits that they introduced and explained within the JSSF. *See* JSSF Exs. A-R, Docket Nos. 39-1 through 39-18.

Defendants filed supplemental briefing as to the *Douglas* issue. *See* Defendants['] Supplemental Brief in

---

1

Compel Arbitration and Dismiss Claims as to Plaintiff Eric Weber ("MTC"), Docket No. 28. Plaintiffs oppose the motion.  *See* Plaintiff Eric Weber's Opposition to Amazon's Motion to Compel Arbitration and Dismiss Claims ("MTC Opp'n"), Docket No. 30.  Defendants have filed their Reply.  *See* Reply Brief in Support of Amazon's Motion to Compel Arbitration and Dismiss Claims as to Plaintiff Eric Weber ("MTC Reply"), Docket No. 33. The second motion at issue is Defendants' Motion to Dismiss Rees for Lack of Personal Jurisdiction ("MTD"), Docket No. 27. The Court addresses each in turn.

**B. Allegations Common to All Named Plaintiffs**[2]

Amazon is a Delaware corporation with its principal place of business in Washington. FAC ¶ 6.  Amazon Services, a wholly owned subsidiary of Amazon, was incorporated in Nevada with its principal place of business in Washington.[3]  Declaration of Jason Massello in Support of Amazon's Motion to Dismiss Claims as to Plaintiff Bryan Rees for Lack of Personal Jurisdiction ("Massello Decl.") ¶ 4, Docket No. 27-1.  Audible, another Amazon subsidiary, is incorporated in Delaware with its principal place of business in New Jersey.  *Id.*  Audible provides access to audiobooks and other audio content to consumers.  *Id.* ¶ 5.  Signing up for Audible requires an existing Amazon.com account or the creation of a new Amazon.com account.  *Id.*  Audible members use payment methods on file with Amazon to use Audible.  *Id.*

Consumers must provide a payment method to Defendants (*i.e.* a credit or debit card) to make purchases on Amazon.com.  FAC ¶ 9.  Defendants do not inform customers that this payment method will automatically and indefinitely be stored on Amazon.com unless the consumers affirmatively delete them.  *Id.* ¶ 10.  Similarly, Defendants do not inform consumers that the payment method can be charged without notice if the Amazon account holder signed up for a subscription service that Defendants or their affiliates or their supported retailers offer.  *Id.* Examples of these services include Amazon Prime and Audible, among others.  *Id.*  Defendants

---

Support of Motion to Compel Arbitration ("Defs.' Supp."), Docket No. 41.  Plaintiffs filed their own supplemental brief.  *See* Plaintiff Eric Weber's Supplemental Brief in Opposition to Amazon's Motion to Compel Arbitration and Dismiss Claims ("Pls.' Supp. Opp'n"), Docket No. 44.  Defendants filed a reply in support of their supplemental briefing.  *See* Defendants' Supplemental Reply Brief in Support of Motion to Compel Arbitration as to Eric Weber ("Defs.' Supp. Reply"), Docket No. 45.  Plaintiffs filed a sur-reply.  *See* Plaintiff Eric Weber's Surreply in Opposition to Amazon's Motion to Compel Arbitration and Dismiss Claims ("Pls.' Sur-Reply"), Docket No. 46-1. Defendants then filed a response to Plaintiffs' Sur-Reply.  *See* Defendants' Response to Plaintiff's Surreply in Opposition to Motion to Compel Arbitration and Dismiss Claims ("Defs.' Sur-Reply Resp."), Docket No. 47-1.

[2] Allegations in Sections I.B, I.C, and I.D with citations to the FAC are merely Plaintiffs' allegations.

[3] By contrast, the FAC alleges that Amazon Services has its principal place of business in Nevada.  FAC ¶ 7.

put forward this policy to ensure they, the affiliates, and the retailers get paid; they do not limit the policy by requiring payment makers and account holders to have the same last name, for example. *Id.* ¶ 11. These practices are applied uniformly to all consumers nationwide. *Id.* ¶ 13.

The "Privacy Notice" and other disclosures do not properly disclose Defendants' practice of sharing customers' payment information with affiliates and retailers. *Id.* ¶ 12. Instead, Defendants tell customers that their payment information will remain private and secure. *Id.*

### C. Plaintiff Weber's Experience

Weber is a citizen and resident of Los Angeles, County, California. FAC ¶ 4. In mid-2017, Weber used a corporate credit card to purchase work supplies on Amazon.com. *Id.* ¶ 14. Weber did so at his boss's request. *Id.* Defendants never informed Weber that this corporate credit card would be stored on Amazon.com unless Weber affirmatively deleted it. *Id.* Weber never consented to having that credit card charged automatically for future purchases, and he thought that the corporate credit card would only be charged for future purchases with his express authorization. *Id.* ¶¶ 14, 15.

Several months after making the above purchase of work supplies, Weber's boss confronted him about charges Audible made to the corporate credit card. *Id.* ¶ 16. Weber had signed up for Audible earlier in 2017, but he designated his personal rather than corporate credit card for Audible payments. *Id.* After investigating the Audible charges, Weber determined: (1) that the corporate credit card information was automatically stored on his Amazon.com account, (2) Defendants initiated automatic transfers of $14.95 from the corporate credit card to Audible without notifying Weber or obtaining his authorization, and (3) those charges would have continued but for Weber's boss informing him of the charges on the corporate credit card and his later deletion of the corporate credit card from his Amazon.com account. *Id.* This situation caused problems at Weber's work, and he spent multiple working hours attempting to fix the situation. *Id.* ¶ 17.

### D. Plaintiff Rees's Experience

Rees is a citizen and resident of North Carolina. FAC ¶ 5. Rees used his girlfriend's Amazon.com account to make a purchase several years ago. *Id.* ¶ 18. In making that purchase, Rees used his own personal debit card, and he provided his debit card information to Defendants. *Id.* As with Weber, Defendants never told Rees they would permanently store his debit card information on his girlfriend's Amazon.com account, nor did he consent to having his debit card

charged automatically in connection with future purchases without his express authorization. *Id.* ¶¶ 18, 19. Rees never authorized his girlfriend to make purchases using his debit card nor did she make any purchases on Amazon.com using Rees's debit card. *Id.* ¶ 19.

In September 2017, Rees discovered an unauthorized Audible charge for $15.96 on his debit card, and he later discovered another $15.96 Audible charge in August 2017. *Id.* ¶ 20. Rees was never an Audible customer, though his girlfriend was. *Id.* Rees's girlfriend had one of her personal credit cards designated for payments to Audible and never designated Rees's debit card for Audible payments. *Id.* After investigating the situation, Rees concluded that: (1) Defendants automatically stored his debit card information on his girlfriend's Amazon.com account, (2) Defendants automatically initiated payments to Audible from his debit card without notifying Rees or his girlfriend, and (3) the charges would have continued automatically had he not discovered them and asked his girlfriend to delete his debit card from her Amazon.com account. *Id.* Neither Rees nor his girlfriend received notice from Defendants or Audible that Rees's girlfriend's designated card had been declined, they were never asked to designate an alternative payment method, and they never received notice that transfers had automatically been made from Rees's debit card to Audible. *Id.* ¶ 21.

## II. **Defendant's Motion To Compel Arbitration**

### A. **Relevant Background Specific to Motion to Compel**[4]

#### 1. Amazon and Amazon's Conditions of Use

Through the website Amazon.com, consumers can purchase millions of different goods from both Amazon itself and from third-party sellers. *See* Declaration of Karen Ressmeyer in Support of Amazon's Motion to Compel Arbitration ("Ressmeyer Decl.") ¶ 2, Docket No. 28-1. Amazon provides customers with the option of joining Amazon Prime, which provides members with free shipping, access to movies and television shows, and a host of other benefits, in exchange for an annual or monthly membership fee. *Id.*

From 2008 until August 19, 2011, Amazon's Conditions of Use ("COU") did not contain

---

[4] On July 17, 2017, this Court granted Amazon's motion to compel arbitration as to Plaintiff Grant McKee in a related action. *See McKee* Order. There, the Court found that Amazon had demonstrated, by a preponderance of the evidence, that McKee had agreed to the arbitration agreement in Amazon's Conditions of Use when he signed up for the Amazon Prime service and by making various purchases through the standard check-out page for Amazon. *See McKee* Order at 17-18 n.7. The Court further held that this arbitration agreement was not unconscionable and was enforceable. *Id.* at 22. More discussion of the *McKee* Order follows in the analysis section below.

an arbitration provision.  *See* JSSF Exs. A-B, Docket Nos. 39-1, 39-2.[5]  Weber first placed an order on Amazon's website in March of 2010, when the COU in JSSF Exhibit A was in place. *See* JSSF at 1 ¶ 1.  Since August 19, 2011, the COUs have contained an arbitration agreement. *See* JSSF Exs. C-M, Docket Nos. 39-3 through 39-13.  Between August 19, 2011 and September 6, 2012, the arbitration clause in the COU read as follows:

> **Any dispute or claim relating in any way to your visit to Amazon.com or to products or services sold or distributed by Amazon or through Amazon.com will be resolved by binding arbitration, rather than in court**, except that you may assert claims in small claims court if your claims qualify. The Federal Arbitration Act and federal arbitration law apply to this agreement.

JSSF at 2 ¶ 3; *id.* Ex. C at 25 (bold in original).  The COU contained the following arbitration clause from September 6, 2012 until at least April 20, 2018:

> **Any dispute or claim relating in any way to your use of any Amazon Service, or to any products or services sold or distributed by Amazon or through Amazon.com will be resolved by binding arbitration, rather than in court**, except that you may assert claims in small claims court if your claims qualify.  The Federal Arbitration Act and federal arbitration law apply to this agreement.

*See e.g.*, JSSF Ex. D at 32, E at 39, F at 46, G at 55, H at 65, I at 75, J at 84, K at 94, L at 104, M at 112 (boldness in originals); JSSF at 2-3 ¶¶ 4-13.  Pursuant to Amazon's COUs from 2008 until at least April 2018, Amazon "reserve[d] the right to make changes to [its] site, policies, and these Conditions of Use at any time."  *See* JSSF Exs. A at 12, B at 18, C at 26, D at 32, E at 39, F at 47, G at 56, H at 65, I at 76, J at 84, K at 95, L at 105, M at 112.  The COUs bearing this clause are silent on whether such modifications will, or can be made without notice, if and how a customer can object to such modifications, and whether continued use of the product operates as acceptance of the revised terms.  *See generally id.*  The COUs have been changed over ten times since 2008.  *See* Declaration of Jamin Soderstrom in Support of Opposition to Motion to Compel ("Soderstrom Decl."), Docket No. 30-3 at ¶ 2 (describing multiple version of the Amazon COU); *see also* JSSF Exs. A-M.

> 2.  <u>Weber's Use of Amazon and Amazon Prime</u>

Amazon's records reflect two customer accounts associated with Weber's Yahoo e-mail

---

[5] The dates for these COUs are found in the joint stipulated statement of facts.  *See* JSSF at 1 ¶¶ 1-2.

address: a merchant account with activity dating back to December 27, 2004, and a non-merchant account started in March 15, 2010. *See* Ressmeyer Decl. at ¶ 4; *id.* Exs. 3-4, Docket Nos. 28-4, 28-5. The parties have stipulated to the fact that "Weber has no reason to dispute that he used the standard checkout method for the specific purchases reflected in the records amazon has provided." JSSF at 3 ¶ 14. Weber has placed hundreds of purchase orders through Amazon since Amazon first adopted an arbitration provision in August 2011. *See* Ressmeyer Decl. at ¶ 9, Exs. 10-11, Docket Nos. 28-11, 28-12; JSSF Exs. N-O, Docket Nos. 39-14, 39-15. Weber oftentimes made purchases by accessing Amazon.com on his mobile phone. Plaintiff Eric Weber's Declaration in Support of His Opposition to Amazon's Motion to Compel Arbitration and Dismiss Claims ("First Weber Decl.") ¶ 4, Docket No. 30-1. Recently, Weber has declared more specifically that he estimates "at least 80% of the purchases [he has] made on Amazon.com were using [his] smartphone, with that percentage being higher in recent years." Supplemental Declaration of Plaintiff Eric Weber in Support of His Opposition to Amazon's Motion to Compel Arbitration and Dismiss Claims ("Second Weber Decl.") ¶ 2, Docket No. 44-2.

It is unclear whether Weber affirmatively signed up for Amazon Prime membership ("Prime") on October 26, 2017, or if he was automatically enrolled on that day as a result of a purchase he completed on September 26, 2017, a purchase for which he may have initiated a free 30-day trial of Prime in order to receive free shipping. *See* First Weber Decl. ¶ 5; *see also* Soderstrom Decl. ¶ 5; *see id.* Exs. 4-5 (screenshots of mobile and desktop sign-up process for free 30 day trial). This is largely irrelevant for the MTC because "Amazon is no longer relying on Mr. Weber's sign up with Amazon Prime as a basis to compel arbitration for purposes of this motion." *See* JSSF at 6 ¶ 22.

### 3. Amazon's Online Purchase Process(es)

Customers may place orders with Amazon on three platforms: (1) Amazon.com's website accessed via desktop ("Standard Website"), (2) Amazon.com accessed on a mobile device ("Mobile Website"), and (3) on the Amazon mobile application ("Mobile Application"). *See* JSSF at 4 ¶ 16. Each platform has its own unique checkout screen, and the parties have stipulated to and submitted screenshots, also known as "Flows," of each as they appeared on six agreed upon dates in 2017 and 2018 ("2017 and 2018 Flows").[6] *See* JSSF Ex. P (compilation of

---

[6] Those agreed upon dates are February 21, 2017, February 28, 2017, and March 10, 2017 (collectively, "2017 Agreed Purchase Dates"); and March 13, 2018, March 14, 2018, and March 18, 2018 (collectively, "2018 Agreed

two images showing two possible ways standard checkout pages may appear on a desktop for the 2017 and 2018 Agreed Purchase Dates, hereinafter "2017 and 2018 Desktop Flows"); *see id.* Ex. Q (standard checkout page as it appeared on the Amazon.com mobile website for the 2017 and 2018 Agreed Purchase Dates, hereinafter "2017 and 2018 Mobile Website Flow"); *see id.* Ex. R (standard checkout page as it appeared on the Amazon mobile application for the 2017 and 2018 Agreed Purchase Dates, hereinafter "2017 and 2018 Mobile Application Flow").

Plaintiffs have provided evidence that demonstrates there are multiple versions of the Flows currently and/or historically encountered by users like Weber. *See* Soderstrom Decl. ¶ 4 (detailing ability to find alternative versions of the flows attached to Ressmeyer's declaration); *see id.* Ex. 3, Docket 30-6 (examples of alternate Flows).   The parties have stipulated to and submitted Weber's Amazon standard checkout purchase history, but that provides no indication of which specific Flow Weber encountered on a given day (other than the fact one of the four 2017 and 2018 Flows appeared on the given 2017 and 2018 Agreed Purchase Dates). *See* JSSF at 3 ¶ 14; *see id.* Exs. N-O.

The four 2017 and 2018 Flows submitted along with the JSSF contain at least one "Place your order" button either immediately above, immediately below, or immediately next to a disclosure that reads "By placing your order you agree to Amazon's privacy notice and conditions of use." *See* JSSF Exs. P-R.  The 2017 and 2018 Mobile Website Flow, *see* JSSF Ex. Q, submitted (eventually) by Amazon also contains an additional "Place your order" button that is not in close proximity to the disclosure that appears by the first button; it comes after various sections regarding the customer's review of the order (and below that second button there is a link to the COU a half-screen distance away from it, but no disclosure similar to that above the first button).  The 2017 and 2018 Mobile Application Flow is substantially the same but there is not even a link to the COU under the second "Place your order" button. *See* JSSF Ex. R.

The first of the two 2017 and 2018 Desktop Flows has two "Place your order" buttons in total, with those buttons located on the right side of the screen and at the bottom of the screen. *See* JSSF Ex. P at 130.  Both of those buttons have the disclosure text immediately below or next to them. *See id.*  The second of the 2017 and 2018 Desktop Flows, *see id.* at 131, has one "Place your order" button on the right side of the screen with the disclosure text immediately below it.

In the four 2017 and 2018 Flows, the phrases "privacy notice" and "conditions of use" in

---

Purchase Dates").  JSSF at 4 ¶ 15.

the disclosures are hyperlinked and blue, while the rest of the disclosure's font is grey or black. JSSF Exs. P-R. The font of the disclosures in all the 2017 and 2018 Mobile Flows is approximately 1/2 the size of the font used on the "Place your order" button(s), whereas the font of the disclosures in the 2017 and 2018 Desktop Flows is similar in size to the buttons. *See id.* Exs. P-R. If a customer clicks on the appropriate hyperlink the customer is directed to Amazon's COU, which contains the arbitration agreement in effect at the time (if one is in effect at all). *See* Ressmeyer Decl. ¶ 6.

### B.  Legal Standard

The Federal Arbitration Act ("FAA") reflects a "liberal federal policy favoring arbitration." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2010) (citation omitted). A party aggrieved by the refusal of another party to arbitrate under a written arbitration agreement may petition the court for an order compelling arbitration as provided for in the parties' agreement. *See* 9 U.S.C. § 4. "By its terms, the [FAA] leaves no room for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 213 (1985) (emphasis in original); *see also* 9 U.S.C. § 4. "The court's role under the Act is therefore limited to determining: (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue. If the response is affirmative on both counts, then the Act requires the court to enforce the arbitration agreement in accordance with its terms." *Daugherty v. Experian Info. Solutions, Inc.*, 847 F. Supp. 2d 1189, 1193 (N.D. Cal. 2012) (quoting *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000)). "While the Court may not review the merits of the underlying case '[i]n deciding a motion to compel arbitration, [it] may consider the pleadings, documents of uncontested validity, and affidavits submitted by either party.'" *Macias v. Excel Bldg. Servs. LLC*, 767 F. Supp. 2d 1002, 1007 (N.D. Cal. 2011) (quoting *Ostroff v. Alterra Healthcare Corp.*, 433 F. Supp. 2d 538, 540 (E.D. Pa. 2006)).

On a motion to compel arbitration, courts apply a standard similar to the summary judgment standard applied under Rule 56 of the Federal Rules of Civil Procedure ("Rule 56"). *Concat LP v. Unilever, PLC*, 350 F. Supp. 2d 796, 804 (N.D. Cal. 2004) (citing *McCarthy v. Providential Corp.*, No. C 94-0627, 1994 WL 387852, at *2 (N.D. Cal. July 19, 1994)). Under Rule 56, "[a] party may object that the material cited to support or dispute a fact cannot be

presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).  "[T]o survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56."  *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003) (quoting *Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001)) (internal quotation marks omitted).

Similarly, at the summary judgment stage courts do not "focus on the admissibility of the evidence's form," but rather "on the admissibility of its contents."  *Fraser*, 342 F.3d at 1036. Objections on the basis of a failure to comply with the technicalities of authentication requirements or the best evidence rule are, therefore, inappropriate.  *See Adams v. Kraft*, No. 5:10-CV-00602-LHK, 2011 WL 5079528, at *25 n. 5 (N.D. Cal. Oct. 25, 2011) ("On summary judgment, unauthenticated documents may be considered where it is apparent that they are capable of being reduced to admissible evidence at trial."); *Hughes v. United States*, 953 F.2d 531, 543 (9th Cir. 1992) (holding that even if declaration violated best evidence rule, court was not precluded from considering declaration in awarding summary judgment).

Defendants argue that Weber assented to Amazon COUs, and the arbitration provision contained therein on hundreds of occasions, including each time he made a purchase on one of Amazon's available platforms, and, most recently when he signed up for a Prime account on October 26, 2017.[7]  *See* MTC at 6-7.  Defendants further argue that the arbitration provision is enforceable, and encompasses the present claims.  *See id.* at 9-12.  As a result, Defendants ask the Court to compel Weber to arbitration under the FAA.

**C. Analysis**

Plaintiffs oppose the motion on several grounds.  *See generally* MTC Opp'n.  First, Plaintiffs argue that because Weber originally agreed to a version of the Amazon COU that did not contain an arbitration provision, any subsequent agreement to a modified version of the COU is deficient unless he is made aware that the COU has changed.  *See id.* at 9-14.  Plaintiffs also argue that the evidence Defendants provide fails to actually establish that Weber provided properly noticed assent via one of the Flows.  *Id.* at 15-18.  Finally, Plaintiffs initially, but no longer need to, argue that Defendants fail to establish that Weber ever signed up for Prime on October 26, 2017, in a manner that provided him constructive notice of Prime's terms.  *Id.* 19-

---

[7] In the JSSF, the parties stipulated that Amazon no longer relies on Weber's sign up with Amazon Prime as a basis to compel arbitration for purposes of this motion.  *See* JSSF at 6 ¶ 22.

23.[8]

### 1. Choice of Law

Federal courts sitting in diversity look to the law of the forum state when making choice of law determinations. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Under California law, the parties' choice of law reflected in a contract clause will govern provided the chosen state bears a substantial relationship to the parties or their transaction and enforcement of the provision does not violate a fundamental public policy of California. *Hatfield v. Halifax PLC*, 564 F.3d 1177, 1182-83 (9th Cir. 2009) (quoting *Boracchia v. Biomet, Inc.*, No. C-07-0650 MMC, 2008 WL 512721, at *3 (N.D. Cal. Feb. 25, 2008)). A substantial relationship exists between a party and the state in which that party is domiciled, resides, or is incorporated. *See Nedlloyd Lines B.V. v. Superior Court*, 3 Cal.4th 459, 467 (1992) (holding incorporation and domicile status create substantial relationship); *see also Software, Ltd. v. Photon Infotech Private, Ltd.*, No. 5:12-CV-04382-EJD, 2014 WL 1728705, at *3, (N.D. Cal. May 1, 2014) (collecting cases holding that a party has a "substantial relationship" to its state of domicile or incorporation). Enforcing a choice of law provision does not violate a fundamental public policy of California if doing so would not create a conflict with California law. *Nedlloyd*, 3 Cal. 4th at 466; *see also Wash. Mut. Bank, FA v. Super. Ct.*, 24 Cal. 4th 906, 916-17 (Cal. 2001). Washington law, at least in the context of consumer protection, does not conflict with California law. *See Fagerstrom v. Amazon.com, Inc.*, 141 F. Supp. 3d 1051, 1063-64 (S.D. Cal. 2015) (noting that "[i]f the two states' laws are not equally protective of consumers, and equally hostile to unconscionable terms in consumer contracts, they are certainly close," and that "a plausible case can be made that Washington's unconscionability doctrine is more protective of consumers than California's . . . .") (emphasis in original). The burden is on the party opposing the choice-of-law provision to establish both the "fundamental conflict" and "materially greater interest" prongs. *See Wash. Mut.*, 24 Cal. 4th at 917 (Cal. 2001) ("If the proponent of the clause . . . demonstrates that the chosen state has a substantial relationship to the parties or their transaction . . . [the] parties' choice generally will be enforced unless the other side can establish both that the chosen law is contrary to a fundamental policy of California and that California has a materially greater interest in the determination of the particular issue.").

Here, all the Amazon COUs that the parties submitted as part of the joint statement of

---

[8] The Court will disregard this argument. *See* JSSF at 6 ¶ 22.

stipulated facts, *see* JSSF Exs. A-M, contain a choice of law provision that provides for the application of the laws of the state of Washington. Additionally, the parties do not dispute that Defendant Amazon has Washington as its principle place of business. *See* Masselo Decl. ¶ 4; FAC ¶ 6. Furthermore, there does not appear to be, nor has Plaintiff argued that Washington law conflicts with California law on the relevant issue of contract formation and the enforceability of arbitration provisions. As such, the Court would, in keeping with California choice of law principles, honor the parties' choice of law provision and apply Washington law.[9]

### 2. Whether a valid arbitration agreement exists

Here, Defendants argue that Weber agreed to Amazon's later COUs that bear an arbitration provision when he made hundreds of purchases on Amazon between late 2011 and the present. *See generally* MTC.

"[T]he federal policy favoring arbitration is inapplicable to the determination of whether a valid agreement to arbitrate between the parties exists." *Campos v. Campos Family Farms, LLC*, No. 12-598-LJO, 2012 WL 2090303, at *8 (E.D. Cal. June 8, 2012) (citing *Comer v. Micor, Inc.*, 436 F.3d 1098, 1104 n.11 (9th Cir. 2006)). Rather, that determination is made by reference to ordinary state law contract principles. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). As the party moving to compel arbitration, Defendants bear the burden of proving by a preponderance of the evidence the existence of a valid arbitration agreement. *See Lucas v. Hertz Corp.*, 875 F. Supp. 2d 991, 998 (N.D. Cal. 2012) (citing *Olvera v. El Pollo Loco*, 173 Cal. App. 4th 447, 453 (2009)).

### a. *Mutual Assent*

Under Washington law in order to form a valid contract the parties must manifest their mutual assent. *See Keystone Land & Dev. Co. v. Xerox Corp.*, 152 Wash. 2d 171, 177-78 (2004); *see also Hauenstein v. Softwrap Ltd.*, No. C07-0572-MJP, 2007 WL 2404624, at *2-3, 6 (W.D. Wash. Aug. 17, 2007).[10] In the context of an electronic consumer transaction, the occurrence of mutual assent ordinarily turns on whether the consumer had reasonable notice of a merchant's terms of service agreement. *See, e.g.*, *Nguyen v. Barnes & Noble Inc.*, 763 F.3d

---

[9] The Court notes that, in determining whether a contract was formed in the first place, the choice of law provision is irrelevant. While the parties dispute whether California or Washington law should apply to issues of formation, both concede there is no substantive difference in the states' law of contract formation. For the sake of uniformity, the Court has cited to Washington contract law but would reach the same conclusions under California law.

[10] The relevant California law is functionally identical. *See e.g. Bowman v. Victor*, 83 Cal. App. 2d 693 (1948); *Roth v. Malson*, 67 Cal. App. 4th 552, 557 (1998).

1171, 1173 (9th Cir. 2014) ("We agree with the district court that Barnes & Noble did not provide reasonable notice of its Terms of Use, and that Nguyen therefore did not unambiguously manifest assent to the arbitration provision contained therein."). Reasonable notice in this context requires that the consumer had either actual or constructive notice of the terms of service; constructive notice occurs when the consumer has inquiry notice of the terms of service, like a hyperlinked alert, and takes an affirmative action to demonstrate assent to them. *See id*. at 1176-79. This "inquiry turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract." *Id*. at 1177.

Constructive notice is generally clear where the user is actually required to, and does click a button explicitly agreeing to the terms of the contract, even if the user does not actually read the terms of services. *See e.g.*, *Riensche v. Cingular Wireless, LLC*, C06–1325Z, 2006 WL 3827477, at *1 (W.D. Wash. 2006) (concluding that plaintiff assented to arbitration clause when he indicated his agreement to the terms of service online); *Feldman v. Google*, Civil Action No. 06–2540, 2007 WL 966011, at *5-8 (E.D. Pa. March 27, 2007) (holding that where user had to "click" the "Yes, I agree to the above terms and conditions" button in order to proceed with the online transaction, there was reasonable notice of the terms and mutual assent to the contract). Courts have also found constructive notice where sites contain a disclosure statement that indicates if a user signs up for a given service they accept the terms of service provided the design of the website puts a reasonably prudent user on inquiry notice. *See e.g.*, *Selden v. Airbnb, Inc.*, No. 16-CV-00933 (CRC), 2016 WL 6476934, at *5 (D.D.C. Nov. 1, 2016) (finding that user was bound by an arbitration clause through a "sign-in wrap" agreement) (collecting cases); *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 835 (S.D.N.Y. 2012) (enforcing forum selection clause based on disclosure below "Sign-up" button); *Starke v. Gilt Groupe, Inc.*, No. 13 CIV. 5497 LLS, 2014 WL 1652225, at *3 (S.D.N.Y. Apr. 24, 2014) (enforcing arbitration clause, noting that plaintiff "was directed exactly where to click in order to review those terms, and his decision to click the 'Shop Now' button represents his assent to them."). Courts commonly refer to these agreements as "sign-in-wrap" agreements. *See Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 394-403 (E.D.N.Y. 2015) (describing four general types of online consumer contracts).[11]

---

[11] *Berkson* provides a helpful summary of the four common varieties of electronic contracts of adhesion:

12

Alternatively, some courts have refused to enforce sign-in-wrap or click-wrap agreements where aspects of the website, such as the location and appearance of the disclosure statement, the actual terms of the agreement, and the appearance and location of the hyperlink to the agreement, prevent a reasonable consumer from being on constructive notice.  *See, e.g.*, *Nguyen*, 763 F.3d at 1173 ("Where the link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it, courts have refused to enforce the browsewrap agreement."); *see also Sprecht v. Netscape Communications Corp.*, 306 F.3d 17, 22-23 (2d Cir. 2002) (refusing to enforce terms of use that "would have become visible to plaintiffs only if they had scrolled down to the next screen"); *Metter v. Uber Technologies, Inc.*, Case No. 16-cv-06652-RS, 2017 WL 1374579 (N.D. Cal. April 17, 2017) (denying motion to compel arbitration where sign-in-wrap agreement was only visible if user scrolled down, an action not necessary to complete the sign-up process); *Meyer v. Kalanick*, 199 F. Supp. 3d 752, 763 (S.D.N.Y. 2016) (refusing to enforce agreement where plaintiff "did not have to click any button explicitly indicating assent to Uber's User Agreement").

While courts addressing constructive notice in internet commerce have avoided establishing hard and fast rules, review of the case law at the district level provides important guidance.  Again *Berkson* includes a helpful summary:

> First, "terms of use" will not be enforced where there is no evidence that the website user had notice of the agreement; "the validity of the [Internet] agreement turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract." *Nguyen*, 763 F.3d at 1177 (emphasis added) (collecting cases).
>
> Second, "terms of use" will be enforced when a user is encouraged by the design and content of the website and the agreement's webpage to examine the terms clearly available through hyperlinkage.  *See, e.g.*, *Ticketmaster Corp.*, 2003 U.S. Dist. LEXIS 6483, 2003 WL 21406289, at *2 (noting that the warning on website that further use binds a user to the "terms of

---

Browsewrap exists where the online host dictates that assent is given merely by using the site.  Clickwrap refers to the assent process by which a user must click "I agree," but not necessarily view the contract to which she is assenting.  Scrollwrap requires users to physically scroll through an internet agreement and click on a separate "I agree" button in order to assent to the terms and conditions of the host website.  Sign-in-wrap couples assent to the terms of a website with signing up for use of the site's services.

97 F. Supp. 3d at 394-95.

use" "could not be missed"); *see also cf.* Woodrow Hartzog, *Website Design as Contract*, 60 Am. U. L. Rev. 1635, 1664-70 (2011) (discussing features of website design that hinder understanding of privacy policies).

        Third, "terms of use" will not be enforced where the link to a website's terms is buried at the bottom of a webpage or tucked away in obscure corners of the website where users are unlikely to see it. *See, e.g., Specht*, 306 F.3d at 23 (refusing to enforce "terms of use" that "would have become visible to plaintiffs only if they had scrolled down to the next screen"); *In re Zappos.com*, 893 F. Supp. 2d at 1064 ("The Terms of Use is inconspicuous, buried in the middle to bottom of every Zappos.com webpage among many other links, and the website never directs a user to the Terms of Use."); *Van Tassell*, 795 F. Supp. 2d at 792-93 (refusing to enforce arbitration clause in internet agreement that was only noticeable after a "multi-step process" of clicking through non-obvious links); *Hines*, 668 F. Supp. 2d at 367 (plaintiff "could not even see the link to [the terms and conditions] without scrolling down to the bottom of the screen − an action that was not required to effectuate her purchase").

97 F. Supp. 3d at 401-02.

    With this guidance in mind, and after a review of several but admittedly not all of the myriad click-wrap and sign-in agreements examined by courts throughout the country, the Court turns to the specifics of the 2017 and 2018 Flows that Weber confronted when he made his purchases in order to determine if they afforded sufficient constructive notice.[12]

        i.  The 2017 and 2018 Desktop Flows Would Afford Constructive Notice

    As a legal matter, the Court would find that the design of the two 2017 and 2018 Desktop Flows, as they appear attached as Exhibit P to the JSSF, would provide sufficient notice to Weber if he used either of them to make a purchase. This is because the disclosure and COU hyperlink on the 2017 and 2018 Desktop Flows is of the same nature as those upheld in courts across multiple districts, including those applying Washington law. *See, e.g.*, *Doe v. Project Fair Bid Inc.*, No. C11-809 MJP, 2011 WL 3516073, at *4 (W.D. Wash. Aug. 11, 2011) ("This kind of 'clickwrap' agreement has been upheld in several cases in this circuit and elsewhere.");

---

[12] The parties have not agreed which of the 2017 and 2018 Flows Weber faced on the 2017 and 2018 Agreed Purchase Dates, though they agree that he necessarily used at least one of them.  JSSF at 4-5 ¶ 16 ("Amazon contends, and Plaintiff does not dispute, that all purchases [presumably only on the 2017 and 2018 Agreed Purchase Dates] were necessarily made through either the Amazon.com desktop website (Exhibit P), mobile website (Exhibit Q), or Amazon mobile app (Exhibit R)).

*Hauenstein v. Softwrap Ltd.*, No. C07-0572-MJP, 2007 WL 2404624, at *2-3, 6 (W.D. Wash. Aug. 17, 2007) (enforcing arbitration agreement because plaintiff "manifested his assent to the License Agreement by 'clicking' the appropriate box."); *see also Selden*, No. 16-CV-00933 (CRC), 2016 WL 6476934, at *5 (finding that user was bound by an arbitration clause through a "sign-in wrap" agreement) (collecting cases); *Fteja*,  841 F. Supp. 2d at 835; *Starke*, No. 13 CIV 5497 LLS, 2014 WL 1652225, at *3 (enforcing arbitration clause, noting that plaintiff "was directed exactly where to click in order to review those terms, and his decision to click the 'Shop Now' button represents his assent to them.").

Further, unlike cases in which courts refused to enforce provisions where the disclosures were not visible without additional scrolling, the disclosures on the 2017 and 2018 Desktop Flows checkout pages appear *directly* below or next to the "Place your order" buttons.  *See JSSF Ex. P.  Unlike the cases on which Plaintiffs rely, the checkout pages do not bury the disclosures on a submerged screen, or obscure their view through pop-ups.  *See Sprecht*, 306 F.3d at 32 (finding "a reference to the existence of license terms on a submerged screen is not sufficient to place consumers on inquiry or constructive notice of those terms."); *see also Metter*, Case No. 16-cv-06652-RS, 2017 WL 1374579 (denying motion to compel arbitration where sign-in agreement was only visible if user scrolled down).  The 2017 and 2018 Desktop Flows have linguistic precision in that the disclosures correspond to the action being taken, with the label on the buttons stating "Place your order."  *See JSSF Ex. P.  The font size of the "Place your order" buttons and the disclosures are similar in size.  *See id.*

In sum, the Court agrees that the 2017 and 2018 Desktop Flows afford constructive notice, so the question remains of whether Weber ever made a purchase using those Desktop Flows.  Amazon argues that Weber has admitted that he made at least one purchase using a desktop on the 2017 and 2018 Agreed Purchase Dates.  Defs.' Supp. Reply at 2.  In support of that argument, Amazon points to Weber's Second Declaration, where he estimates that "at least 80% of the purchases [he has] made on Amazon.com were using [his] smartphone, with that percentage being higher in recent years."[13]  Second Weber Decl. ¶ 2.  Plaintiffs rebut, arguing that there is no direct evidence that Weber visited the desktop checkout page on any of the six

---

[13] Defendants slightly mischaracterize Weber's estimate, saying that this declaration equates to an admission that Weber made 20% of Amazon purchases with a desktop.  Defs.' Supp. Reply at 2 (arguing that "[b]y Mr. Weber's own estimate, roughly 20% of these would have occurred on the Amazon desktop checkout flow.").  That is not exactly the case, as per the aforementioned cited language in Weber's May 2018 Declaration.

dates making up the 2017 and 2018 Agreed Purchase Dates.  Pls.' Supp. Opp'n at 3.

The Court would agree with Plaintiffs that there is no direct evidence that Weber used the 2017 and 2018 Desktop Flows to carry out a purchase on any of the six 2017 and 2018 Agreed Purchase Dates.  Even in the JSSF, the parties stipulated that "Amazon has not provided Plaintiffs' counsel records showing which type of device was used to make purchases on the 2017 Agreed Purchase Dates and 2018 Agreed Purchase Dates."  *See* JSSF at 4 ¶ 16.  Plaintiffs proffer six purchase dates where the parties have agreed Weber would have faced *either* the 2017 and 2018 Desktop Flows *or* the 2017 and 2018 Mobile Flows.  The Court cannot be sufficiently certain that on one of those six days Weber actually used a desktop and thus encountered one of the 2017 and 2018 Desktop Flows.[14]  Nonetheless, in the JSSF facts the parties stipulate that "Amazon's records submitted in support of its Motion show that between his two accounts, Mr. Weber made purchases using the standard checkout method at least 450 times since creating his accounts."  *See* JSSF at 4 ¶ 15.  Indeed, based on Amazon's representations to Plaintiffs' counsel, "Weber has no reason to dispute that he used the standard checkout method for the specific purchases reflected in the records Amazon has provided."  *See id.* at 3 ¶ 14 (citing JSSF Exs. N-O).

The Court would request Amazon to provide evidence of whether Weber would have seen one of the two 2017 and 2018 Desktop Flows if he made a purchase on his computer on all or most of the dates when COUs with arbitration provisions existed, *see* JSSF Exs. C-M.  If Defendants can prove as much for 30 purchase dates reflected in JSSF Exhibits N or O, the Court would conclude that based on the high number of applicable purchases that it is a near statistical certainty that Weber used one of the two 2017 and 2018 Desktop Flows at least once to complete a purchase.[15]  If on the other hand Defendants cannot provide sufficient evidence to satisfy its burden,[16] the Court would conclude that Defendants failed to meet its burden in showing Weber

---

[14] Even assuming Weber used his desktop device 20% of the time, it is certainly possible that for the specific six purchases making up the 2017 and 2018 Agreed Purchase Dates he did not use his desktop and thus used the 2017 and 2018 Mobile Flows for all those purchases rather than the 2017 and 2018 Desktop Flows.

[15] The Court recognizes that it previously requested a stipulation as to Amazon Flows for a "few dates certain."  *See* Weber MTC Ruling I at 15.  But the Court did not anticipate Plaintiffs' argument that Weber did not use the 2017 and 2018 Desktop Flows for any of the stipulated 2017 and 2018 Agreed Purchase Dates.  As such, the Court requests more evidence from Defendants to determine whether the likelihood that Weber did *not* face the 2017 and 2018 Desktop Flows is negligible.

[16] In Plaintiffs' supplemental sur-reply, they argue that the Court's decision should not rest on Weber's

used one of the 2017 and 2018 Desktop Flows to make a purchase.

ii.   The 2017 and 2018 Mobile Flows

Amazon argues that regardless of whether Weber made purchases using the 2017 and 2018 Desktop Flows, Weber's purchases using the Amazon Mobile Website Flow, *see* JSSF Ex. Q, or the Amazon Mobile Application Flow, *see* JSSF Ex. R, were sufficient because the 2017 and 2018 Mobile Flows provide constructive notice.  Supp. Reply at 3.

As to the 2017 and 2018 Mobile Flows, *see* JSSF Exs. Q-R, the question is a bit closer than with the 2017 and 2018 Desktop Flows.  The first of the two 2017 and 2018 Mobile Flows, *see* JSSF Ex. Q, reflects the standard checkout screen on the mobile website, whereas the second flow, *see* JSSF Ex. R, is the standard checkout screen on the mobile application.  These two flows are substantially the same.  They both contain a "Place your order" button at the top, with a smaller font disclosure immediately above the button stating "By placing your order, you agree to Amazon.com's privacy notice and conditions of use."  *See* JSSF Exs. Q-R.  For both flows, after the first button there is an "Order Summary," followed by sections on the "Shipping address," "Payment Information," and "Shipment details."  *See id.*  Then, at the bottom below all the aforementioned sections is a second "Place your order" button.  *See id.*  That second button, unlike the first button, does not contain the text "By placing your order, you agree to Amazon.com's privacy notice and conditions of use."  *See id.*  The only significant difference between the 2017 and 2018 Mobile Flows is that for the 2017 and 2018 Mobile Website Flow, there is a hyperlink to the COU a half-screen below the second "Place your order" button

---

agreeing to a modified COU and arbitration clause between October 26, 2017 and October 26, 2018, because for that period he signed up for his own Amazon Prime membership.  *See* Pls.' Sur-Reply at 2.  According to Plaintiffs, Amazon could not condition Weber's existing and pre-paid Amazon Prime membership on a subsequent agreement to arbitrate.  *See id.*  Defendants rebut, arguing that: (1) there is no conflict in Plaintiff's enjoyment of Prime benefits and his agreement to arbitrate when making purchases from Amazon; (2) Weber earlier claimed he had no reason to and did not intentionally sign up for Amazon Prime (he used someone else's account); and (3) Weber's Prime sign-up on October 26, 2017 would not matter for purposes of this motion if he used a sufficient flow prior to that point.  *See* Defs.' Sur-Reply Resp.

The Court agrees with Defendants' third argument that Weber's Prime sign-up on October 26, 2017 may be irrelevant for purposes of this motion *but only if* the Court ultimately concludes that Weber used (or that there was a negligible chance he did not use) a sufficient flow like the 2017 and 2018 Desktop Flows to make a purchase prior to October 26, 2017.  As to the rest of the arguments, neither side provides *any case law* on whether the fact Weber would have had to sacrifice something of value (*i.e.* the benefits of his Prime membership) to accept the updated COU would have an effect on this analysis.  The one case Plaintiffs cite in this regard, *Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 468 (S.D.N.Y. 2017), does not directly touch on this issue.  As such, if Defendants cannot provide adequate evidence that Weber made Amazon purchases on 30 dates prior to October 26, 2017, on which the 2017 and 2018 Desktop Flows were in effect if he did use a desktop, the Court would at that point request supplemental briefing on this issue.  This briefing would come into play if Defendants could only provide evidence for 30 dates inclusive of those post-dating October 26, 2017.

17

(though there is no disclosure anywhere near it).  *See id.* Ex. Q.  On the other hand, the 2017 and 2018 Mobile Application Flow does not even have a hyperlinked COU below the second "Place your order" button (and similarly contains no disclosure there).  *See id.* Ex. R.

Plaintiffs argue that the 2017 and 2018 Mobile Flows contain a design flaw.  Pls.' Supp. Opp'n at 3.  According to Plaintiffs, "[a] disclosure placed next to a button *that is not pressed* does not give reasonable notice and cannot secure informed consent."  *Id.* (emphasis in brief). Plaintiffs further assert that the Court should not "*guess* that Weber *must have* pressed a 'Place your order' button with a disclosure next to it on one of the Agree Purchase Dates."  *Id.* (emphasis in brief).  Weber now declares that when he uses his smartphone, he scrolls down to review the order details and then he does "not scroll back to the top of the webpage before pressing the button to complete [his] purchase."  Second Weber Decl. ¶ 2.

In response, Defendants contest the assertion that the 2017 and 2018 Mobile Flows contain a fatal flaw for purposes of constructive notice.  Def.'s Supp. Reply at 3.  Defendants point to the fact that the disclosure is at the top of the page above the checkout button, rather than buried at the bottom of the page or on a submerged screen.  *Id.*  Defendants also deemphasize the second button and argue that Weber's prior declaration that he was unsure of which button he used, *see* First Weber Decl. ¶ 4, negates his recent declaration that he always scrolls to the bottom to click the second button, *see* Second Weber Decl. ¶ 2.  Furthermore, Defendants argue that even if Weber used the second button, the disclosure at the top put a reasonably prudent person on notice.  *Id.* at 4.

As to the 2017 and 2018 Mobile Flows, the Court incorporates the cases referenced in the preceding section analyzing the 2017 and 2018 Desktop Flows.  Breaking down the 2017 and 2018 Mobile Flows in light of the parties' arguments, there are a number of elements that may cut toward a finding of constructive notice.  First, the disclosure text above the COU is one of the first pieces of text on the screen; every consumer would have that text appear at the top of the screen on every transaction.  *See* JSSF Exs. Q-R.  Second, the COU is hyperlinked for ease of reference.  *See id.*  Third, the text above the first "Place your order" button uses precise and parallel language making it clear that through the action of clicking the button the consumer agrees to the hyperlinked COU.  *See id.*

On the other hand, there are two major factors cutting against a finding of constructive notice: the text above the first "Place your order" button is in small font and the *second* "Place

your order" button contains no disclosure related to the COU directly above or under it.[17]  *See id.*  Ultimately, the Court finds it unavailing that the first "Place your order" button has a disclosure above it because the vital information related to the customer's order *follows* the first "Place your order" button, and once customers reach the end of the "Order Summary," "Shipping address," "Payment Information," and "Shipment details" sections they are confronted with the second "Place your order" button bearing no disclosures in or around it.  The Court finds it unlikely that consumers, and especially Weber based on his recent declaration, *see* Second Weber Decl. ¶ 2, would scroll back up to the top and click the first "Place your order" button and examine the COU hyperlinked above that first button.

Therefore, the Court concludes that the 2017 and 2018 Mobile Flows do not afford constructive notice.  All vital information related to the order comes after the first "Place your order button," so a consumer is unlikely to even notice the small font disclosure above the first button and would instead focus on the second inferior "Place your order" button.

b. *COU Modification Argument under Douglas*

In the opposition to the motion to compel arbitration Plaintiffs argue that, under *Douglas*, Weber cannot be bound to new terms added to the Amazon COU after he first agreed to it unless he receives some affirmative notice that changes were made.  *See* MTC Opp'n at 11-14. After supplemental briefing on *Douglas*, the Court can now turn to analyzing Plaintiffs' modification argument.  The Court will provide a preliminary view on this matter but it will save final judgment for after Amazon provides relevant evidence as to how many of Weber's 2017 and 2018 purchases would have been made using one of the 2017 and 2018 Desktop Flows.

Defendants assert that all Weber had to do was read the hyperlinked COU in front of him when making new purchases, which he was required to agree to when making new purchases. Def.'s Supp. at 4-5.  Defendants also add that the date the COU was last updated appears "in large, offset font" at the top of the COU's text.  *Id.* at 5 (citing JSSF Exs. C-M).  Moreover, Weber's purchases span many years and so a reasonably prudent person would not expect the COU to stay stagnant over time.  *Id.*  These facts distinguish the present case from *Douglas*, according to Amazon.  *Id.*  In response, Plaintiffs argue that accepting Defendants' argument

---

[17] Though the 2017 and 2018 Mobile Application Flow contains a hyperlinked COU (without a disclosure) a half-screen down from the second "Place your order button," that fact is unavailing because it does not connect the action of placing your order with the second button to accepting the COU.  *See* JSSF Ex. R.  Moreover, it is a half-screen away from that button.  *See id.*

would require Weber to press the COU hyperlink, inspect the terms to see if they changed, and then decide whether to agree to those terms is contrary to the rules of contract modification, notice, and consent.  Pls.' Supp. Opp'n at 4.  Plaintiffs argue that these facts mirror those in *Douglas*.  *Id.* at 5.

In *Douglas*, the Ninth Circuit reversed the district court ruling that the plaintiff was bound by the terms of a revised contract when he was not notified of the changes to an existing contract and he had no reason or occasion to visit the changes posted to the defendant's website.  495 F.3d at 1066-67.  There, the plaintiff had a contract for long distance telephone services with America Online ("AOL"), which was acquired by Talk America, Inc. ("Talk America") after that point.  *Id.* at 1065.  Talk America added various provisions to the customer service contract, posting the revised contract on its website but not notifying the plaintiff directly of any changes.[18]  *Id.*  Roughly four years later, the plaintiff filed a class action lawsuit in district court upon discovery of these changes, and the district court granted the defendant's motion to compel arbitration.  *Id.*  The Ninth Circuit held that "[p]arties to a contract have no obligation to check the terms on a periodic basis to learn whether they have been changed by the other side."  *Id.* at 1066.  A party "must obtain the other party's consent before [making changes to the terms of a contract]."  *Id.* (citation omitted).

This Court considered and rejected Defendants' argument in the *McKee* matter.  *See McKee* Order at 17-18 n.7.  In that case, McKee opposed Amazon's motion to compel arbitration, in part on the basis that the first time he agreed to Amazon's COU they did not contain an arbitration agreement and he never received subsequent notice, constructive or otherwise, that the COU ever changed.  *See id.*  McKee claimed that each time he subsequently agreed to the Amazon COU he assumed that no change had been made.   McKee cited Ninth Circuit authority as well as a district court application, both of which were legally relevant but contained important factual differences from McKee's interactions with Amazon.  *See Douglas*, 495 F.3d at 1066-69; *see also Rodman v. Safeway Inc.*, Case No. 11-CV-03003-JST, 2015 WL 604985. *10-11 (N.D. Cal. February 12, 2015) (applying *Douglas* to hold that a plaintiff customer received no notice of changed terms despite making subsequent purchases on the defendant company's website because plaintiff was not required to agree to updated terms and

---

[18] These changes included an arbitration clause, among other provisions.

conditions with each new purchase).

The issue was not extensively argued, but the Court found that *Douglas* and its progeny did not justify denying Amazon's motion to compel.  *See Mckee* Order at 17-18 n.7.  The Court's decision was based on an important factual distinction between McKee and the plaintiff in *Douglas*: McKee had been placed on notice that the Amazon COU had changed when he signed up for Amazon Prime in 2012.  *See id.* ("Plaintiff agreed to the updated Amazon COU when he signed up for Prime in 2012 . . . . Upon doing so, Plaintiff was placed on notice that Amazon's COU had 'changed over time' and was directed to carefully review those terms.  This distinguishes the case at bar from *Douglas* . . . .") (citations omitted).[19]  The Court also mentioned that McKee had failed to provide any examples of district courts that had applied *Douglas* to customers that had repeatedly agreed to hyperlinked conditions of use.  *Id.*  For that reason, the Court did not address whether, in the absence of the Prime Terms, Amazon owed McKee affirmative notice that the Amazon COU had changed such that, when he made additional purchases he was aware that he was agreeing to the modified, as opposed to the original, COU.  Nonetheless, the Court did note that "no district court has applied *Douglas* to hold that repeated purchases that require agreeing to hyperlinked Conditions of Use do not constitute assent to those terms as written at the time of purchase."  *Id.*

The Court does not dispute that "[u]nder Washington contract law, such unilateral modifications are only binding if there is notice and assent to the changed terms."  *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 235 (2d Cir. 2016) (applying Washington law and citing *Gaglidari v. Denny's Restaurants, Inc.*, 117 Wash. 2d 426, 435 (1991)).[20]  Here, assuming that Defendants submit sufficient evidence of Weber's use of the 2017 and 2018 Desktop Flows, Weber would be on notice that placing his order rendered his acceptance of the hyperlinked COUs, even if they were updated.  Though the text immediately below or next to the "Place your order" buttons in the 2017 and 2018 Desktop Flows do not mention a change to the COU, upon clicking the hyperlinked COU in the precise disclosure adjacent to the buttons (which Weber

---

[19] Here, unlike in *McKee*, Defendants no longer rely on a Prime sign-up for purposes of this motion.  *See* JSSF at 6 ¶ 22.

[20] In other respects *Nicosia* is inapposite because there a motion to dismiss was at issue and Amazon did not seek in that motion "an order compelling arbitration nor indicated that Amazon would seek to force Nicosia to arbitrate in the future, [so] it was proper not to construe the motion to dismiss as a motion to compel arbitration, to which the summary judgment standard would apply."  834 F.3d at 230.

21

would have necessarily agreed to through pressing the "Place your order" button, as per the precise disclosure text above or next to the button), the COUs since August 2011 state at the very top the date the COU was last updated. JSSF Exs. C-M. The Court also recognizes that pursuant to all COUs from 2008 until at least April 2018, Amazon "reserve[d] the right to make changes to [its] site, policies, and these Conditions of Use at any time."[21] *See* JSSF Exs. A at 12, B at 18, C at 26, D at 32, E at 39, F at 47, G at 56, H at 65, I at 76, J at 84, K at 95, L at 105, M at 112.

The Court would conclude that these facts in the aggregate make the present case distinguishable from *Douglas* and the other cases Plaintiffs cite.[22] It would likely find that Weber assented to the updated COU terms, including the arbitration provision, if the aforementioned issues are resolved in Defendants' favor upon adequate evidence of Weber using the 2017 and 2018 Desktop Flows.

c. *Scope of the Arbitration Provisions*

If the Court finds in Defendants' favor on the aforementioned issues, it would find that the scope of the arbitration provisions in JSSF Exhibits C through M encompass this dispute. [23] *See, e.g.*, JSSF Ex. D (providing that "**Any dispute or claim relating in any way to your use of any Amazon Service, or to any products or services sold or distributed by amazon or through Amazon.com will be resolved by binding arbitration** . . . .") (boldness in original). Other courts have held that similar Amazon arbitration provisions encompass both past and future transactions; this broad scope would surely cover this case. *See, e.g.*, *Ekin v. Amazon Servs., LLC*, 84 F. Supp. 3d 1172, 1178 (W.D. Wash. 2014).

### III. <u>Motion to Dismiss for Lack of Personal Jurisdiction</u>

Plaintiffs argue that the Court: (1) has specific personal jurisdiction over Rees's claims

---

[21] The COUs bearing this clause are silent on whether such modifications will, or can be made without notice, if and how a customer can object to such modifications, and whether continued use of the product operates as acceptance of the revised terms.

[22] Defendants argue that because Weber declared he did not know Amazon changed COUs, he necessarily had notice of COU modifications when he made purchases subsequent to that declaration. Defs.' Supp. Reply at 4-5 (citing First Weber Decl. ¶ 3). The Court need not consider this argument because the Court would find notice under *Douglas* as is (assuming Defendants submit the requested evidence).

[23] Unlike in McKee, here Plaintiffs did not meaningfully make arguments related to the enforceability of Amazon's COUs in terms of unconscionability or otherwise. *See* MTC Opp'n at 17 (mentioning the word "unconscionable" the only time in the brief). The Court therefore need not address those arguments and view them as waived. If the Court deemed arguments related to unconscionability not waived, it would hold that the arbitration clauses found in the proffered Amazon COUs, *see* JSSF Exs. C-M, are not unconscionable for the same reasons as stated in the *McKee* Order. *See McKee* Order at 18-22.

and (2) the exercise of pendent jurisdiction is proper because all of Rees's claims arise out of a common nucleus of operative facts.  MTD Opp'n at 4-22.  Nonetheless, the Court would wait for the evidence requested as to the motion to compel arbitration before confronting the motion to dismiss Rees's claims for lack of personal jurisdiction, as the issues may intertwine.

## IV. <u>Conclusion</u>

For the reasons stated above, the Court would **DEFER** consideration of Defendants' Motion to Compel.  The Court also would **DEFER** consideration of the Defendants' MTD given the potential effect that Weber's continued participation, or lack thereof, in the lawsuit might have on the personal jurisdiction analysis that is the primary subject of that motion.

The Court requests from Defendants evidence substantiating at least 30 purchase dates from JSSF Exhibit O on which Weber, if he accessed his desktop on those dates, would definitively have faced either of the two 2017 and 2018 Desktop Flows in making his Amazon purchases.  If Defendants cannot show sufficient evidence of 30 applicable dates from before October 26, 2017 (when Weber's Prime membership began) but can demonstrate evidence for 30 applicable dates only if they include Weber's purchases on or after October 26, 2017, then both sides must submit *one total brief* of no more than three pages in length addressing *case law* on how Weber's existing Prime membership affects Weber's proper assent to an updated COU after that point.